**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MARLAYNA TREGO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00460** |
| | ) | **Judge Aleta A. Trauger** |
| **PENSKE LOGISTICS, LLC,** | ) | |
| **PENSKE LEASING CO., L.P., and** | ) | |
| **BRIDGESTONE AMERICAS TIRE** | ) | |
| **OPERATIONS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM</u>**

**I.      INTRODUCTION**

Plaintiff Marlayna Trego pursues claims against her former employer, Penske Logistics, LLC and Penske Leasing Co., L.P. (collectively, "Penske"), for discrimination, failure to accommodate, and retaliation under several federal and state statutory schemes, as well as claims for interference with her leave rights under federal and state law. She brings all the same claims against Bridgestone Americas Tire Operations, LLC ("Bridgestone"), based on her allegations that Bridgestone and Penske operated as "joint employers and/or an integrated enterprise" and that each of them "had the authority to, and did, determine the terms and conditions of Ms. Trego's employment." (Doc. No. 28, Am. Compl. ¶ 29.)

Bridgestone and Penske agree, however, that Penske was the plaintiff's sole employer and that Bridgestone had nothing to do with the plaintiff's employment. (*See, e.g.*, Doc. No. 29, Penske Ans. ¶¶ 28 (admitting that it was Trego's employer), 29 (denying that Bridgestone and Penske operated as joint employers or an integrated enterprise); Doc. No. 30, Bridgestone Ans. ¶¶ 28, 29

(same)).) Now before the court is Bridgestone's Motion for Summary Judgment (Doc. No. 45), which seeks dismissal of the plaintiff's claims against it—all of which are premised upon Bridgestone's qualifying as the plaintiff's employer—on the basis that the undisputed facts establish that it was never the plaintiff's employer or joint employer and did not operate as an integrated enterprise with Penske, the plaintiff's actual employer.

The plaintiff, for reasons that are not clear, vigorously defends against Bridgestone's motion and asserts that material factual disputes preclude summary judgment for Bridgestone. (*See* Doc. No. 54, Pl.'s Resp. Opp. Bridgestone's M. Summ. J.; Doc. No. 55, Pl.'s Resp. Bridgestone's Statement of Undisputed Material Facts ("RSUMF").) Bridgestone has filed a Reply. (Doc. No. 61.)

The plaintiff's attempts to salvage her claims against Bridgestone are utterly futile, and Bridgestone's motion will be granted.

## II.    DISCUSSION

All of the claims against Bridgestone are premised upon Bridgestone's having been the plaintiff's "employer" as defined by the various statutory schemes governing the claims. There is no dispute here that Bridgestone did not actually employ the plaintiff and that Penske did. (RSUMF ¶ 22.) Trego's pay and benefits all came from Penske; her W-2 came from Penske; her supervisors were all Penske employees. (*Id.* ¶¶ 17, 27–29.) Likewise, it is clear that Bridgestone and Penske are separate legal entities, are not subsidiaries of one another, and are not under the same corporate structure or parent company. (*Id.* ¶ 3.) Bridgestone and Penske have always had separate bank accounts, capital structures, financial records, and employee payrolls. (*Id.* ¶ 4.)

However, "[e]ntities that do not otherwise meet the definition of employer (either because they do not formally employ the plaintiff or do not meet the numerosity requirement) may still

face liability through the single-employer or joint-employer doctrines." *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011) (citation omitted).

Under the "single-employer" doctrine, also called the "integrated enterprise" doctrine, "two companies may be considered so interrelated that they constitute a single employer subject to liability" for employment discrimination. *Passmore v. Mapco Express, Inc.*, 447 F. Supp. 3d 654, 662 (M.D. Tenn. 2017) (quoting *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997)). Courts consider the following four factors in determining whether two companies should be deemed a single employer: "(1) common ownership, (2) common management, (3) centralized control of labor relations, and (4) interrelation of operations." *N.L.R.B. v. Palmer Donavin Mfg. Co.*, 369 F.3d 954, 957 (6th Cir. 2004) (citing *Swallows*, 128 F.3d at 993–94). "The presence or absence of any of these factors is not conclusive, but 'control over labor relations is a central concern.'" *Sanford*, 449 F. App'x at 494 (quoting *Swallows*, 128 F.3d at 994).

The joint-employer doctrine applies when the plaintiff establishes that "a business that maintains sufficient control over some or all of the formal employees of another business as to qualify as those employees' employer." *Sanford*, 449 F. App'x at 491. Generally, "[w]hether a joint employer relationship exists depends upon 'such factors as the supervision of the employees' day to day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, [and] issuance of operating instructions.'" *N.L.R.B. v. Centra, Inc.*, 954 F.2d 366, 370 n.2 (6th Cir. 1992) (quoting *W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244, 247 (7th Cir. 1988)). Similarly, courts have found joint employer status to exist when "two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of

employment." *Carrier Corp. v. N.L.R.B.*, 768 F.2d 778, 782 (6th Cir. 1985). The primary factors to be considered are "an entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance." *E.E.O.C. v. Skanska USA Bldg., Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013). Deciding whether joint employer status exists requires looking "holistically . . . at the totality of the factors in the aggregate, rather than requiring satisfaction of all the factors." *Edmondson v. Nissan N. Am., Inc.*, No. 3:22-cv-00513, 2024 WL 4635051, at *10 (M.D. Tenn. Oct. 30, 2024) (Crenshaw, J.) (citing *Sanford*, 327 F. App'x at 594).

In this case, Bridgestone contracted with Penske to deliver Bridgestone products to destinations dictated by Bridgestone. (RSUMF ¶ 6.) Penske owned the trucks used to deliver Bridgestone's products to customers, and the trucks say "Penske" on them. (*Id.* ¶ 7.) Penske employed drivers to drive Penske trucks delivering tires manufactured by Bridgestone. The plaintiff in this case was one of those employees. She was assigned by Penske to pick up her deliveries from a distribution center owned and managed by Bridgestone in Lebanon, Tennessee.

In an attempt to establish the existence of material factual disputes that would preclude summary judgment for Bridgestone, the plaintiff purports to dispute a number of Bridgestone's proffered Statements of Undisputed Material Facts. The plaintiff asserts that:

> (1) Penske "uses and 'controls' the real estate and equipment owned by Bridgestone at the Bridgestone distribution center (RSUMF ¶ 5);
>
> (2) Bridgestone dictated Penske's delivery routes (*id.* ¶ 8 (citing Doc. No. 51-3, Peterman Dep. 22–23));
>
> (3) Bridgestone was involved in "management" (*id.* ¶ 9 (citing Doc. No. 54-1, Bridgestone Rule 30(b)(6) Dep. 28–24 [sic], 30));
>
> (4) Bridgestone directed deliveries through setting the time, place, and manner of deliveries (*id.* (citing Bridgestone Rule 30(b)(6) Dep. 20–22, 32–35, 44, 49–50, 53–54; Peterman Dep. 21–23; Doc. No. 63-1, Trego Dep. 186–87);
>
> (5) Bridgestone approved driver assignments (*id.* (citing Peterman Dep. 22–23));

(6) Penske informed Bridgestone of hiring and firing, and Bridgestone reported issues with Penske employees (*id.* (citing Bridgestone Rule 30(b)(6) Dep. 39, 52–—53));

(7) Bridgestone contractually required Penske to "provide drivers to deliver and unload Bridgestone's tires" (*id.* (citing Doc. No. 44, Penske SUMF ¶ 3));

(8) Bridgestone "[s]pecifically direct[ed] how deliveries are made to Bridgestone-owned warehouses and stores staffed by Bridgestone employees (*id.* (citing Bridgestone Rule 30(b)(6) Dep. 36–37, 54–55; Peterman Dep. 18–19, 35, 47)); and

(9) Bridgestone was "part of the accommodation review process for Ms. Trego" (*id.* (citing Trego Dep. 183–84; Doc. No. 51-1, Trego Decl. ¶ 9; Doc. No. 51-4, Horn Dep. 34:17-20 & Exs. 1–2).

However, the cited evidence does not, for the most part, support Trego's claims that Bridgestone exercised any control over Penske employees or operated as a joint enterprise with Penske. Bridgestone's corporate representative testified that Bridgestone employees and Penske drivers have essentially "no interaction," aside from when Penske drivers come to the Penske office in the Bridgestone distribution center to pick up their driver packet, at which time they "may talk to an hourly Bridgestone employee to pick up their driver packet." (Bridgestone Rule 30(b)(6) Dep. 20; *accord* Trego Dep. 186–87.) Otherwise, Bridgestone, during the relevant time, had a weekly "managers meeting" with managers for all of its contractors, including Penske (*see id.* at 23.) Bridgestone never discussed specific employees with Penske. (*Id.* at 25, 27.)[1]

Although Bridgestone established the routes for its deliveries and provided these to Penske, Penske assigned its drivers to those routes. (*Id.* at 32–35.) Bridgestone had nothing else to do with the process. (*Id.* at 35.) Bridgestone does not approve any job descriptions or job performance by

---

[1] The plaintiff points out that Rocky Cantrell, as one of Bridgestone's Rule 30(b)(6) representatives, testified that he was "not aware" of conversations between Bridgestone and Penske about any Penske employees, not that no such conversations occurred. (*See* Bridgestone Rule 30(b)(6) Dep. 27.) Kimberly Dietrick, Bridgestone's human resources business partner for the Lebanon distribution center and its other Rule 30(b)(6) representative, also testified that, to her knowledge, no one at Bridgestone had a conversation with anyone at Penske about Trego. (*Id.* at 76–77.) In any event, there is no evidence that such conversations *did* occur.

Penske drivers and does not receive workplace complaints from Penske employees. (*Id.* at 38.) If a Bridgestone employee has a complaint about a Penske employee, "[t]hat would be addressed through the Penske management team." (*Id.* at 38.) Bridgestone employees have no supervisory role over Penske drivers or Penske supervisors. (*Id.* at 51–52.) Bridgestone is not involved in disciplining, hiring or firing of Penske employees, is not consulted about the hiring and firing of Penske employees, and is not informed if a particular Penske employee is hired or fired. (*Id.* at 38–39, 52.) According to Bridgestone, Bridgestone is not involved in a Penske employee's request for an accommodation. (*Id.* at 39.) Bridgestone's human resources business partner for the Lebanon distribution center, Kimberly Dietrick, testified that she has nothing to do with "contractor employees," including Penske employees, that Penske never discussed with her Trego's restrictions, and that she never told anyone at Penske that "Bridgestone agreed that [the plaintiff's] restrictions could not be accommodated." (*Id.* at 72, 76.)

Bridgestone maintains records of what deliveries are made, but no records reflecting what driver made them. (Bridgestone Rule 30(b)(6) Dep. 47.) Bridgestone dictates what deliveries are to be made and the order in which the delivery routes are to be run, but it does not dictate any "procedures or specifications for how those deliveries are made." (*Id.* at 53–54.) It has no control over the offloading process except that it plans how trailers are loaded, so that the tires for the last stop are in the back and the tires for the first stop are in the front. (*Id.* at 54.) It has no procedures for "how product physically gets off the truck." (*Id.*) It is not "consulted about the physical requirements for drivers." (*Id.* at 55.) Bridgestone would not be consulted about medical leave or light duty for Penske employees. (*Id.* at 58.)

Trego's direct supervisor at Penske, Brian Peterman, similarly testified that Bridgestone was in charge of the "routing process." (Peterman Dep. 21–22.) The route information is given to

Penske approximately forty-eight hours in advance of the day the routes are to be run, and Penske's "driver manager/dispatcher/route planner" takes the "book of work" from Bridgestone and provisorily assigns drivers to cover the routes, and then tells Bridgestone it has the routes covered. (*Id.* at 22.) At that point, Penske receives an electronic data interchange ("EDI") transmission from Bridgestone that "takes the loads, as well as the stops that are on those loads, and puts them into the dispatch board, our management board within the system. The drivers that were kind of soft assigned are then assigned to the loads, and then we know what we're going to be doing in the next 48 hours." (*Id.* at 22–23.) Bridgestone, however, has nothing to do with assigning drivers or approving drivers. (*Id.* at 23.)

The sole evidence of Bridgestone's involvement comes from the plaintiff, who claims that Penske leave specialist Ivelis Horn told her that "Bridgestone was ultimately who was going to make the decision on whether [Trego] could be accommodated on the account or not" and "confirmed with [her] that Bridgestone did make a decision about that." (Trego Dep. 183.) Trego claims that this statement was in one of Horn's emails to her, which said that the decision to accommodate "wasn't even up to Penske, it was up to Bridgestone." (*Id.* at 184.) The plaintiff was "pretty certain" she had an email from Horn that said as much. (*Id.*) She has produced no such email. The plaintiff reiterated the same understanding in her Declaration, where she also states that she was "aware of notes and emails sent to [her] and others that state 'the location' could not accommodate [her] restrictions, which [Trego] interpreted to mean Bridgestone." (Doc. No. 51-1, Trego Decl. ¶ 9.)

For her part, Horn did not "recall conversations with anyone at Bridgestone" and did not "recall" telling Trego that "Bridgestone was the ultimate decision-maker about what happened on their account." (Doc. No. 63-2, Horn Dep. 34.) Horn's notes regarding Penske's leave team's first

meeting about Trego indicate that it was attended only by Penske employees. (*See* Horn Dep. Ex. 1, Doc. No. 51-4 at 78.) Those notes do not refer to Bridgestone. The use of the term "location" (as in "Location is unable to accommodate") obviously refers to the Bridgestone distribution center from which Trego's job was based, but, aside from Trego's deposition testimony, nothing in the record suggests that Bridgestone was consulted about the plaintiff's need for accommodations. Kimberly Dietrich, Bridgestone's HR person at the Lebanon distribution center, denies discussing Trego with Penske. (Bridgestone Rule 30(b)(6) Dep. 76–77.)

Regardless, drawing all reasonable inferences in the plaintiff's favor, and assuming for purposes of Bridgestone's Motion for Summary Judgment that Horn told her that Bridgestone would have to approve an accommodation, that testimony, in light of the totality of the evidence in the record (particularly as discussed in the court's Memorandum[2] addressing the plaintiff's and Penske's Motions for Summary Judgment), is not remotely sufficient to establish that Bridgestone was the plaintiff's joint employer. Its control over the delivery routes that Penske was contractually obligated to run does not show that Bridgestone had any supervision over Penske employees' day-to-day activities, had the authority to discipline, hire or fire, or maintained any control over Penske's employees. Irrespective of what Horn may have told Trego, Bridgestone denies having any involvement in Penske's accommodation process, and there is simply no evidence from which a reasonable jury could find that Bridgestone was involved in the process. Nor is there evidence suggesting that Bridgestone shared any control over Penske's employees or governed the terms and conditions of Penske employees' essential terms of employment. *Carrier Corp.*, 768 F.2d at 782; *Skanska USA*, 550 F. App'x at 256; *Sanford*, 327 F. App'x at 594).

---

[2] That Memorandum is being issued simultaneously with this Memorandum.

Similarly, that Penske, pursuant to a contract with Bridgestone, picked up Bridgestone tires from a Bridgestone facility to deliver them to locations dictated by Bridgestone does not establish the existence of an integrated enterprise as opposed to a simple contractual relationship. The plaintiff points to no evidence that would establish "(1) common ownership, (2) common management, (3) centralized control of labor relations, [or] (4) interrelation of operations." *Palmer Donavin*, 369 F.3d at 957.

Bridgestone is entitled to summary judgment.

### III.     CONCLUSION

For the reasons set forth herein, Bridgestone's Motion for Summary Judgment (Doc. No. 45) will be granted. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge