# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARLAYNA TREGO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00460** |
| | ) | **Judge Aleta A. Trauger** |
| **PENSKE LOGISTICS, LLC,** | ) | |
| **PENSKE LEASING CO., L.P., and** | ) | |
| **BRIDGESTONE AMERICAS TIRE** | ) | |
| **OPERATIONS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiff Marlayna Trego pursues claims against her former employer, Penske Logistics, LLC and Penske Leasing Co., L.P. (collectively, "Penske"), for sex and pregnancy discrimination under the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann § 4-21-101 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k); for discrimination, retaliation, failure to accommodate, failure to engage in the interactive process, and forced medical leave under the federal Pregnant Workers Fairness Act ("PWFA"), 42 U.S.C. § 2000gg *et seq.*, and the Tennessee Pregnant Workers Fairness Act ("TPWFA"), Tenn. Code Ann. § 50-10-101 *et seq.*; discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201 *et seq.*; and interference and denial of rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Tennessee Maternity Leave Act ("TMLA"), Tenn. Code Ann. § 4-21-408. (*See* Doc. No. 28, Am. Compl. ¶ 1.)

Now before the court are cross-Motions for Summary Judgment filed by Penske and the plaintiff (Doc. Nos. 43, 48), each seeking judgment in her or its favor.[1] As set forth herein, the plaintiff's motion will be denied entirely based on obvious factual disputes. Penske's motion will be granted in part and denied in part.

## I.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence

---

[1] Also pending is a separate Motion for Summary Judgment filed by defendant Bridgestone America Tire Operations, LLC (Doc. No. 45), seeking judgment in its favor on the basis that it was never at any point the plaintiff's employer or joint employer and did not operate as an integrated enterprise with Penske, the plaintiff's actual employer. That motion is addressed separately in a Memorandum issued simultaneously with this Memorandum.

is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248. At the same time, however, a defendant seeking summary judgment only needs to show that the plaintiff lacks sufficient evidence to prove a single element of a particular claim in order for the defendant to be entitled to summary judgment on that claim. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) ("As the party moving for summary judgment, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of Plaintiff's claim.").

Conversely, when a plaintiff moves for summary judgment on her own claims, for which she carries the burden of proof and persuasion at trial, she faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). She must show the absence of a material factual dispute on all of the essential elements of her claim. *See Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) ("In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's 'initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" (quoting *Cockrel*, 270 F.3d at 105)). The moving party "must always bear this initial burden, whether or not the adverse party responds according to the rules of civil procedure." *Wilson v. City of Zanesville*, 954 F.2d 349, 351 (6th Cir. 1992) (citations omitted). Summary judgment in favor of the party with the burden of proof "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## II.     THE PLAINTIFF'S MOTION

### A.     Facts[2]

Penske is in the business of, among other things, providing transportation and freight management services for customers with which it contracts to supply such services. (*See* Doc. No. 57, Pl.'s Resp. to Penske's Statement of Undisputed Material Fact ("SUMF") ¶ 1.) Defendant Bridgestone America Tire Operations, LLC ("Bridgestone") is one such customer. Bridgestone

---

[2] The facts in this section for which no citation is provided are drawn directly from Penske's Response to the plaintiff's Statement of Undisputed Material Facts (Doc. No. 59) and are undisputed, at least for purposes of the plaintiff's motion. All facts set forth in this section are either undisputed or viewed in the light most favorable to Penske, as the nonmoving party vis-à-vis the plaintiff's summary judgment motion.

and Penske have a contract under which Bridgestone pays Penske to deliver tires manufactured by Bridgestone to locations directed by Bridgestone. (Doc. No. 45-1, Hillis Decl. ¶ 4; Doc. No. 51-3, Peterman Dep. 22–26.)

Plaintiff Marlayna Trego was employed by Penske as a Class A Truck Driver from January 4, 2023 until June 5, 2024. As a Penske employee, she delivered tires manufactured by Bridgestone. (Doc. No. 28, Am. Compl. ¶ 32.)

After the plaintiff had missed three days of work in late July 2023, her supervisor, Penske's Operations Manager Brian Peterman, instructed her to call Penske's Leave Team. As Peterman explained, under Penske policy, "once you are absent for three days, you need to contact the leave team in order to come back to work." (Peterman Dep. 63.) Trego called the Leave Team, and the person who called her back after she left a message was leave team specialist Ivelis Horn. (Doc. No. 63-2, Horn Dep. 12, 19.)

In their telephone call on July 28, 2023 (*see* Doc. No. 44 at 205), Trego informed Horn that she was, or might be, pregnant. According to Horn, the plaintiff had not yet confirmed her pregnancy, but she had an upcoming doctor's appointment and might "need an accommodation." (Horn Dep. 23.) Horn did not tell the plaintiff she could not return to work until she got restrictions from her doctor, and any discussion of accommodations at that time was hypothetical, because the plaintiff had not actually determined whether she would need any type of restriction. (Horn Dep. 23–24.) However, Horn recalled that Trego believed "that there was another associate being accommodated in the shuttle runs." (*Id.* at 25). Horn did not know about this other employee but told Trego that accommodations were handled on a case-by-case basis. (*Id.*) Horn recalled that she did "mention" to Trego that, "if she was not able to complete her essential functions of the job, she

would need to request a leave of absence while [they] worked through the accommodation process." (*Id.* at 24.)

On or about July 31, 2023, Trego submitted a doctor's note that confirmed her pregnancy, with a due date of March 12, 2024, and identified two work-related restrictions: not lifting over twenty pounds and needing frequent water and restroom breaks. Trego told Horn that she could be accommodated by taking water and restroom breaks as needed while on the road and, with respect to the lifting restriction, either delivering to locations that did not require her to unload cargo or performing a "shuttle" driver position with shorter routes.

On August 2, 2023, Horn met with her supervisor, Melissa Fegley, as well as Brian Peterman and two other Penske managers, to discuss the plaintiff's accommodation request. (*See* Horn Dep. Ex. 1, Doc. No. 51-4 at 78.) According to Horn's Meeting Notes, the group made the following determinations:

> • Location is unable to accommodate in the current role because the associate's job is touch freight [*i.e.*, unloading freight] and will require associate to lift more than 20lbs.
>
> • There are no other driving positions that are no[t] touch freight at that location.
>
> • Reviewed that if we cannot accommodate in the current role what other positions or roles can the associate do within the location. There are no other positions.
>
> • Associate cannot help within the office with Fleet systems because it entails confidential, and associate pay information.

(*Id.*)

On August 11, 2023, Horn emailed Trego, noting that Trego had "been out on a leave of absence since 7/27/2023" and that they had "received documentation from [her] treating physician that indicated [she is] unable to perform the duties required of a driver" due to the restrictions identified in her doctor's letter. (Horn Dep. Ex. 3, Doc. No. 51-4 at 88–89.) The email implied, but did not state, that Trego could not continue to drive trucks for Penske due to her restrictions.

According to Peterman, Penske did not have any discussions about how they could help the plaintiff with the "lifting" parts of her job, because "the 20-pound threshold accommodation was at such a low threshold" that it was clear to Penske that the plaintiff would not be able to perform the essential functions of her job. (Peterman Dep. 76–77.) The company determined that no other positions were available for her and that the only accommodation they could provide would be for her to be out on leave. (*Id.* at 78; *see also* Doc. No. 51-5, Fegley Dep. 51 ("I know we discussed all likely options and determined that we could not accommodate.").) Penske interpreted the twenty-pound lifting restriction to mean that the plaintiff would not be able to physically lift herself into her vehicle, would not be able to lift the truck hood to perform proper pre-trip inspections because the hood weighed more than twenty pounds, and would be unable to "hook[] up the various trailers throughout her shift," which also required "more than 20 pounds of lifting." (Fegley Dep. 53; *see id.* ("We can't have someone else do those things for her because she is a dynamic driver. She does those layovers. She is on the road by herself. There is no one else to do those things.").) According to Peterman, these tasks were all among the essential functions of the plaintiff's job. (Peterman Dep. 73.)

Regarding the freight unloading component of Trego's job (to which the parties refer as the "touch freight" or "throw tires" requirement), Peterman testified that this was the "main issue." (Peterman Dep. 72.) Penske did not have associates at all of the Bridgestone delivery sites who would be available to unload tires in the plaintiff's stead (Fegley Dep. 52).

In view of its inability to identify a way for Trego to continue to perform her job with a twenty-pound lifting restriction, Trego was given leave as an accommodation. Penske maintains, however, that it attempted to engage in the interactive process to explore reassignment as a potential accommodation, but *Trego* refused to work with it. For example, Penske points out that

Horn emailed Trego on August 11, 2023 and again on August 31, 2023, asking her if she wanted Penske to look for other positions she might be able to perform and, if so, to complete and return the Vacant Position Search form (*see* Doc. No. 59 at 42–43), but Trego never responded to this inquiry and never completed or returned the Vacant Position Search form.

Trego claims that Penske accommodated another driver with a worker's compensation injury by allowing him to do only shuttle runs for approximately five months while maintaining his position as a dynamic driver. (Pl.'s SUMF ¶ 19.) Peterman testified that this other driver had a torn rotator cuff and, as a result, had a forty-pound lifting restriction. This driver was accommodated by being placed on "shuttle work" for five months before he was taken off work permanently due to the worker's compensation injury. (Peterman Dep. 56–59.) Penske claims that shuttle work also requires lifting more than twenty pounds. (Fegley Dep. 44; Peterman Dep. 80–81.) In addition, there were no "yard positions" open at the time Trego requested an accommodation. (Peterman Dep. 80–81.) Penske also argues that the plaintiff was unwilling to explore other positions and refused to respond to its request to return and complete the Vacant Position Search form. (*See supra*.)

Documentation beginning August 15, 2023 states that Trego was "approved for continuous leave" under the "ADA" from July 27, 2023 until her due date of March 12, 2024 and under the "federal PWFA / TN Maternity Leave Act" after her due date. (*See, e.g.*, Doc. No. 51-2 at 230–36.) Ultimately, Trego was provided leave as accommodation through her expected due date of March 12, 2024.

Penske contracts with FMLASource, a third-party vendor, to provide administrative support for tracking and securely storing employee medical, leave of absence, and accommodation records. (Fegley Dep. 89.) An FMLASource letter to Trego dated November 20, 2023 indicates

that her request for continuous leave from July 27, 2023 through January 3, 2024 under the FMLA was denied on the basis that she was "[i]neligible" for FMLA leave based on length of employment and hours worked. (Doc. No. 51-2 at 236.) The same letter indicates that Trego was considered ineligible for FMLA leave after the one-year anniversary of her employment based on hours worked. (*Id.* at 236–37.) Nonetheless, the same letter notified the plaintiff of her rights under the TMLA, the PWFA, and the FMLA; explained how to request a leave of absence under the FMLA; and incorporated an FMLA or Leave of Absence Medical Certification form and Return to Work Certification form. (*Id.* at 237–47.)

The plaintiff attests, based on records apparently provided or maintained by Penske, that her "total time" for deliveries from January 2023, when she was hired, through July 2023, when she went out on leave, was 1,716.4 hours, including both "drive time" and "stop duration," and her hours for drive time alone were over 1,300. (Doc. No. 51-1, Trego Decl. ¶ 11 & Ex. 1.)

Trego gave birth on March 4, 2024. She was approved for six weeks of TMLA leave following her delivery based on the "parameters" given to FMLASource by Penske. She received an email from FMLASource on April 8, 2024 informing her that, based on FMLASource's records, she was approved for leave through April 22, 2024 and was expected to return to work on her "first regularly scheduled work day following this date." (Doc. No 51-2 at 248.) However, the same letter also notified her that, if she needed to extend her leave, she should "please contact FMLASource." (*Id.*) She was also expressly notified that, if she "intend[ed] to take additional time for bonding with [her] child immediately following [her] Maternity Leave, [she would] not [be] expected to return to work at this time and . . . [would] receive an additional notice regarding the end date for that leave." (*Id.*) Alternatively, she was instructed to contact the Leave Team if she was ready to return to work. (*Id.*)

Trego did not respond to FMLASource or contact the Leave Team after receiving this email.

On April 18, 2024, Horn reached out to Trego to follow up, reminding her that she had been approved for leave through April 22, 2024 and was expected to return to work on April 23, 2024, unless she requested additional leave. (*Id.* at 252.) Horn directed Trego to reach out to FMLASource to request an extension if she wanted to extend her leave. (*Id.*)

Trego responded to this email the next day, stating: "My employment was effectively terminated when I was forced onto unpaid medical leave against my will in July 2023. I cannot return to a job I was terminated from ten months ago." (*Id.* at 254.)

Despite this response, Penske, through HR Manager Brittany Fleming, emailed and mailed Trego another notice on May 7, 2024, asking her to review the attached "notice regarding [her] returning to work from her approved leave of absence" and to contact Fleming if she had any questions. (*Id.* at 257.) On May 15, 2024, Fleming followed up with a longer email to Trego, detailing Penske's attempts to contact her and "clarify[ing]" that, despite Trego's telling Horn on April 18, 2024 that she had been terminated in July 2023, Penske considered her to be a "current employee" who had been "placed on an approved leave of absence" through April 22, 2024. (*Id.* at 256.)

Fleming's message also explained that Trego, in a previous notice, had been given through May 13, 2024 to request an extension of her leave of absence but that, as of May 15, she had neither returned to work nor requested additional leave. (*Id.*) Fleming continued:

> Marlayna, we must hear from you regarding your leave of absence. You are currently off work without an approved leave of absence, and your time off work since April 22, 2024, is not attendance-protected. Please be aware that if you do not contact FMLASource . . . and update/extend your leave of absence request or we do not hear from you by 5:00 pm EST on May 22, 2024, we will assume you are

no longer interested in returning to Penske and have voluntarily ended your employment with Penske. You will be separated effective May 23, 2024.

(*Id.*) Fleming provided contact information for the Leave Team and FMLASource and urged Trego to reach out if she had questions or needed further clarification. (*Id.* at 257.)

Trego did not respond to this notice.

On June 5, 2024, Fleming sent a letter to Trego that again detailed Penske's attempts to contact her about extending her leave or returning to work, noted that Trego, as of the date of that letter, "ha[d] not contacted Penske to discuss further leave options or to report a return to work date," and informed her that, due to her failure to document her need for additional leave, Penske was "forced to separate [her] from employment due to [her] lack of response." (*Id.*) Trego's last date of employment, from Penske's perspective, was officially June 5, 2024. (*Id.*)

The plaintiff, by that time, had already initiated this lawsuit. (Doc. No. 1.)

**B.     Legal Claims**

As set forth above, the plaintiff's Amended Complaint articulates claims under eight different federal and state statutory schemes, based on varying theories of recovery. For purposes of her Motion for Summary Judgment, the plaintiff characterizes her claims as falling into six[3] different "categories": (1) sex and pregnancy discrimination under Title VII as amended by the PDA, the THRA, the TPWFA, and the federal PWFA; (2) denial of an accommodation and failure to engage in the interactive process under the TWPFA and PWFA; (3) being subjected to "forced leave" in violation of the TWPFA and PWFA; (4) disability discrimination under the "regarded as" prong of the ADA; (5) denial of leave rights under the FMLA and the TMLA; and (6)

---

[3] She asserts that there are five categories but analyzes them as six categories.

retaliation for engaging in protected activity. (*See* Doc. No. 49 at 6 (citing Doc. No. 28, Am. Compl. ¶¶ 81–169); *id.* at 14.) She seeks summary judgment in her favor on all of these claims.

### 1. Category 2: Failure to Accommodate and Failure to Engage in the Interactive Process Under the TPWFA and PWFA

The TPWFA, enacted in June 2020, requires covered employers to engage in the interactive process and make reasonable accommodations for employees who have "medical needs arising from pregnancy, childbirth, or related medical conditions . . . , unless the employer demonstrates that the accommodation would impose an undue hardship on the operation of the business of the employer." Tenn. Code Ann. § 50-10-103(b)(1). Similarly, the federal PWFA, which was enacted on December 29, 2022 and took effect on June 27, 2023, requires covered employers[4] to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 2000gg-1(1). A "known limitation" includes a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

While "the terms 'reasonable accommodation' and 'undue hardship'" as used in the PWFA "have the meanings given such terms" in the ADA, 42 U.S.C. § 2000gg(7), the PWFA and TWPFA expressly require accommodations for "known limitations for medical needs arising from [an] employee's pregnancy, childbirth, or related conditions," Tenn. Code Ann. § 50-10-103(b)(1),

---

[4] Under both statutes, a covered employer is one that employs fifteen or more employees. Tenn. Code Ann. § 50-10-102(2); 42 U.S.C. § 2000gg(2)(B)(i). There is no dispute in this case that Penske qualifies as a covered employer.

including such common things as dehydration and frequent urination, 29 C.F.R. § 1636.3(b);[5] Tenn. Code Ann. § 50-10-102(3)(B), (D) (identifying "[p]roviding more frequent, longer, or flexible breaks" and "[m]odifying food or drink policy" as reasonable accommodations).

To be a "qualified employee" under the PWFA, the employee must be able to "perform the essential functions" of her position, "with or without an accommodation"—but will nonetheless still be deemed "qualified" if her inability to perform an essential function is "temporary," "could be performed in the near future," and "can be reasonably accommodated." 42 U.S.C. § 2000gg(6); 29 C.F.R. § 1636.3(f)(2). Thus, the "[t]emporary suspension of essential function(s) and/or modifications or adjustments that permit the temporary suspension of essential function(s)" are defined in the implementing regulations as reasonable accommodations. *See* 29 C.F.R. § 1636.3(h)(1)(iv). The TPWFA does not incorporate reference to the ADA's "essential functions" concept at all. *See* Tenn. Code Ann. §§ 50-10-102, -103.

### a) *Failure to Accommodate Lifting Restriction*

The PWFA's effective date of June 2023 means that caselaw interpreting it, especially at the summary judgment stage, is scant. *Accord Payne v. W. Mich. Univ.*, No. 1:24-cv-814, 2025 WL 3165213, at *7 (W.D. Mich. Nov. 13, 2025). The few courts considering failure-to-accommodate claims under the PWFA have largely treated them like analogous claims under the ADA. *Id.* (collecting cases); *see also EEOC v. Sec. Assurance Mgmt., Inc.*, No. CV 25-00181,

---

[5] Although the statute took effect a month before the plaintiff sought an accommodation for her pregnancy, the EEOC did not issue regulations to carry out the PWFA until April 15, 2024. The regulations went into effect on June 18, 2024, after this lawsuit was filed. *See* https://www.federalregister.gov/documents/2024/04/19/2024-07527/implementation-of-the-pregnant-workers-fairness-act. Obviously, Penske did not have the benefit of the regulations when it was dealing with the plaintiff's accommodation request, but it does not argue that the timing of the implementation of the regulations has any bearing on its obligation to accommodate the plaintiff's pregnancy-related restrictions.

2025 WL 2911781, at *4 n.4 (D.D.C. Oct. 14, 2025) ("Where the language of the PWFA mirrors that of the ADA or Title VII, the Court applies the legal standards governing ADA and Title VII claims to Plaintiff's corresponding PWFA claims, as the PWFA, ADA, and Title VII all share the same purpose: eliminating workplace discrimination."); H.R. Rep. No. 117-27, pt. 1, at 28 (2021) ("The PWFA uses the term 'reasonable accommodation,' as defined under the ADA, throughout the bill's text."). Thus, to be entitled to summary judgment on a PWFA failure-to-accommodate claim, the plaintiff must establish, as a matter of undisputed fact, that "she is a qualified individual," that Penske "was aware of her limitation," and that it "failed to reasonably accommodate the limitation." *Keiper v. CNN Am., Inc.*, No. 24-CV-875, 2024 WL 5119353, at *2 (E.D. Wis. Dec. 16, 2024) (citing 42 U.S.C. § 2000gg-1(1)).

The plaintiff asserts that there is no question that she was pregnant and qualified for her position, that Penske was aware of her twenty-pound lifting restriction, and that she requested an accommodation for that restriction. However, according to the plaintiff, Penske unreasonably forced her to take medical leave, and the only accommodation it offered was leave, despite the availability of other non-leave accommodations. (Doc. No. 49 at 8.)

According to the plaintiff, her lifting restriction prevented her from manually unloading tires from her truck but did not prevent her from performing any other job function, essential or otherwise. Penske maintains that throwing tires was an essential function integrated into nearly every route that drivers in the plaintiff's position did. It acknowledges that, while the plaintiff spent more time driving than unloading, unloading freight was "critical to the successful completion of her duties." (Doc. No. 58 at 5.) It also argues that elimination of that function would have posed an undue hardship on it, as the plaintiff's proposed accommodations—eliminating the essential unload function by hiring another employee to perform it, thus requiring Penske effectively to hire

two employees to perform a single job designed for one person, or creating new, "no-unload" routes for the plaintiff, which would have required a fundamental alteration in its business operations—were unreasonable as a matter of law. (*Id.* at 8–9.) The plaintiff's Reply argues that Penske's assertions about the fundamental nature of the lifting requirement are unsupported by the factual record and that its assertion that the requested accommodations were unreasonable as a matter of law are not supported by citations to actual law. (Doc. No. 60.)

As an initial matter, "[w]hether a job function is essential is a question of fact that is *typically* not suitable for resolution on a motion for summary judgment." *Kellar v. Yunion, Inc.*, 157 F.4th 855, 877–78 (6th Cir. 2025) (emphasis in original) (quoting *Fresh Prods., LLC*, 985 F.3d 509, 525 (6th Cir. 2021))). Penske's representatives testified that lifting more than twenty pounds was an essential job requirement, and that testimony is corroborated by the formal job description for the plaintiff's Truck Driver – CDL Class A position at Penske, which identifies "what [the employee] will do" in that position as "Delivering product to customers; *unload required*." (Doc. No. 51-2 at 220 (emphasis added).) In other words, the plaintiff's job consisted of two things: driving a truck and unloading the truck. The physical requirements of the job identified in the job description include the ability to "regularly lift and/or move up to 50 lbs/23kg and occasionally lift and/or move up to 100lbs/45kg." (*Id.* at 222.) Peterman testified that a single tire weighs, at a minimum, 25 pounds. (Peterman Dep. 42.) The plaintiff testified that unloading tires was part of her job. (*See, e.g.*, Trego Dep. 73.) The question of whether lifting more than twenty pounds was an essential component of Trego's job is an obviously disputed fact, for purposes of the plaintiff's motion.

There is also a question of fact as to whether Penske could have eliminated that essential component without undue hardship. Penske's witnesses testified that all of the Driver Class A

positions based at the Bridgestone distribution center, where the plaintiff was based, involved "touching freight" and required lifting more than twenty pounds on a regular basis and that requiring it to remodel its routes or to hire additional employees to unload the plaintiff's trucks would not have been feasible. (*See, e.g.*, Peterman Dep. 78; Fegley Dep. 51.) *See also* 42 U.S.C. § 2000gg(7) (incorporating ADA's definition of "undue hardship"); *see also, e.g.*, *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 372 (6th Cir. 2024) (recognizing that the ADA does not require employers to eliminate or reallocate essential job functions or to create new positions (citations omitted)); *Toronka v. Continental Airlines, Inc.*, 411 F. App'x 719, 724 (5th Cir. 2011) (holding that it would not be a reasonable accommodation under the ADA to require an employer to eliminate essential job functions, modify job duties, reassign existing employees, or hire new employees). In other words, for purposes of the plaintiff's motion, there is a material factual dispute as to whether elimination of the freight-unloading component of the plaintiff's job for a period of more than seven months would have posed an undue hardship on Penske. Moreover, the plaintiff has failed to establish, as a matter of undisputed fact, that other non-leave accommodations were actually available.

In sum, the plaintiff is not entitled to summary judgment on her failure-to-accommodate claim under the PWFA or the TPWFA based on the lifting restriction imposed by her physician.

### b)    Failure to Accommodate Restroom and Water Breaks

The plaintiff also insists that she is entitled to summary judgment based on Penske's failure to accommodate her pregnancy-related need for frequent water and restroom breaks, which was one of the two restrictions identified by her medical provider. (*See* Doc. No. 51-2 at 224.) The plaintiff asserts that both the PWFA and the TPWFA bar an employer from seeking supporting medical documentation regarding a request to accommodate more frequent water and restroom breaks, *see* 29 C.F.R. § 1636.3(l)(1); Tenn. Code Ann. § 50-10-103(c), and that Penske violated

this prohibition by contacting Trego's doctor about this restriction. She also contends that Penske thereafter repeatedly confirmed that it could not accommodate her restrictio*ns, plural*, meaning that it could not accommodate her request for frequent restroom and water breaks. For example, she points to the letter she received from Horn, dated August 11, 2023, which stated that Penske had "received documentation from your treating physician that indicates you are unable to perform the duties required of a driver . . . due to the following restrictions: No lifting more than 20 pounds and frequent restroom and water breaks." (Doc. No. 51-4 at 88–89.) She asserts that summary judgment on this claim should be "granted based on this failure alone." (Doc. No. 49 at 8.)

In response, Penske agrees that allowing a pregnant employee to take additional water and restroom breaks as needed are "'predictable assessments' that 'will, in virtually all cases, result in a determination' that they are reasonable accommodations." (Doc. No. 58 at 3–4 (quoting 29 C.F.R.§ 1636.3(j)(4)).) Penske asserts, however, that the request for additional water and restroom breaks was never part of its consideration of whether it could accommodate the plaintiff and that it did not seek medical documentation for this need. Despite the Horn letter referenced above, Penske's corporate representative, Melissa Fegley, testified that Trego's need for frequent restroom and water breaks "didn't make her unable to perform her job. That would not be accommodation because, as the driver, she already has the capacity to determine when she needs to take those breaks and for how long." (Fegley Dep. 152.) Fegley could not explain why that "restriction" was included in Horn's letter, but she reaffirmed that it would "not have been an accommodation because [drivers] already have the ability to make those determinations." (*Id.* at 153.) The plaintiff, similarly, testified that restroom breaks and water breaks were completely within her control as a driver. (Doc. No. 63-1, Trego Dep. 92.) Her supervisor, Peterman, also

testified that additional breaks were not a problem but that "the weight restriction [was] the accommodation that was difficult to get past." (Peterman Dep. 72.)

Despite the fact that the restriction was referenced in Horn's letter and in other communications with the plaintiff, the court finds that there is, at a minimum, a question of fact as to whether either the plaintiff or Penske considered this "limitation" to be an issue that required accommodation. There is no evidence that the parties ever seriously disputed the matter of bathroom breaks or that Penske ever focused on anything other than the plaintiff's lifting restriction. There is no suggestion in the record that, if the plaintiff's need for frequent water and restroom breaks had been her only "restriction," the plaintiff would not have been permitted to work.

As for whether Penske impermissibly requested "documentation" of the plaintiff's restrictions, the implementing regulations containing that prohibition were not in effect in August 2023. Even assuming that the prohibition applied, Horn's contemporaneous notes indicate that she called the plaintiff's doctor's office on August 1, 2023 to confirm "how often breaks are needed and for how long." (Doc. No. 51-4 at 2.) A request for additional information relating to the identified restrictions does not, on its face, appear to violate the regulation limiting an employer's ability to "seek supporting documentation" of the restrictions. 29 C.F.R. § 1636.3(*l*).

The plaintiff is not entitled to summary judgment on this apparently trivial subclaim.

c)      *Failure to Engage in the Interactive Process*

The PWFA's regulations state that, "[t]o determine the appropriate reasonable accommodation, it *may be necessary* for the covered entity to initiate an informal, interactive process" for the purpose of "identify[ing] the known limitation[s] under the PWFA and the adjustment or change at work that is needed due to the limitation[s], if either of these is not clear from the request, and potential reasonable accommodations." 29 C.F.R. §1636.3(h)(3) & (k). The

TPWFA appears to require the employer to "engag[e] in a good faith interactive process with the employee to determine if a reasonable accommodation can be provided absent undue hardship," Tenn. Code Ann. § 50-10-103(c), but it does not define what that process must look like or when it is reasonable to terminate it.

The plaintiff argues that she is entitled to summary judgment on her claim that Penske failed to engage in the interactive process. (Doc. No. 49 at 12.) She contends that the only conversation anyone had with her was her initial conversation with Horn on July 27, 2023, before she even knew for sure whether she was pregnant, and that no one at Penske ever discussed with her any other potential accommodations or her actual restrictions and abilities. (*Id.*)

Penske responds that the plaintiff's twenty-pound lifting restriction was unambiguous and did not require clarification; that it engaged in the interactive process when, after it became clear (to Penske) that it could not accommodate the plaintiff in her current role, it asked the plaintiff to complete a Vacant Position Search form to help it identify other potential roles within the company she could perform; and that the *plaintiff* abandoned the interactive process when she failed to respond to those communications. (Doc. No. 58 at 9–10.) Even after that, Horn and Fegley, according to Penske, continued to engage in efforts to accommodate the plaintiff. (*Id.* at 11.)

The plaintiff's Reply asserts that Penske's Vacant Position Search form was "facially improper," pointing to the EEOC's Final Rule and Interpretive Guidance, Implementation of the Pregnant Workers Fairness Act, 89 FR 29096-01 at ¶ 110, 2024 WL 1679177, at *29207 (April 19, 2024), which states that "an employer who requires an employee who requests an accommodation due to a pregnancy-related limitation to fill out a form identifying their physical and mental impairments would have difficulty demonstrating that this disability-related inquiry is job-related and consistent with business necessity, as required by the ADA." (*See* Doc. No. 60 at

3–4.) Aside from the fact that the referenced guidance was issued in April 2024, the Vacant Position Search form asked the plaintiff simply to identify other jobs she might be interested in filling, not to identify her impairments.

In any event, the evidence in the record shows that the plaintiff communicated her restrictions to Penske; Penske considered them and determined that leave was the only accommodation it could offer; and it asked the plaintiff if she was interested in looking at other possible roles within the company and, if so, to complete and return the Vacant Position Search form. The plaintiff failed to respond. The reasonableness of Penske's offering leave, and only leave, as an accommodation under the circumstances presented here, as discussed above, is a material, disputed fact. While it seems clear that Penske could have done a much better job communicating with the plaintiff about its decision-making process, whether it was required to continue to engage in the interactive process depends largely on whether it had any reason to do so. Penske is correct that, when an employee's identified restrictions and job description are clear, the employer has no need to go back to the employee to clarify them. The PWFA's regulations state only that the interactive process *may be necessary*. The TPWFA requires an employer to "begin engaging in a good faith interactive process," Tenn. Code Ann. § 50-10-103(c). Whether Penske should have done more to engage the plaintiff, after she failed to respond to its request regarding whether she wanted it to look for other positions at her work location or at other locations, is also a question of fact. The plaintiff is not entitled to summary judgment on this claim, under the PWFA or TPWFA.

### 2. Category 3: Being Subjected to Forced Leave

The PWFA and TPWFA prohibit employers from forcing pregnant employees onto leave when another reasonable accommodation would allow them to remain at work. 42 U.S.C. § 2000gg-1(4); Tenn. Code Ann. § 50-10-103(b)(2). Because, as discussed above, there is a material

factual dispute as to whether another reasonable accommodation would have allowed the plaintiff to remain at work, the plaintiff is not entitled to summary judgment on these claims.

### 3. Category 1: Discrimination Based on Sex and Pregnancy

The plaintiff brings (or purports to bring) sex and pregnancy discrimination claims under the PWFA, TPWFA, THRA, and Title VII, as modified by the PDA.[6] She essentially contends that the analysis of her claims is the same under each of the statutory schemes. Her argument for summary judgment on these claims is perfunctory at best. She asserts that (1) like the plaintiff in *Young v. United Parcel Service, Inc.*, 575 U.S. 206 (2015), she was forced to take long-term leave even though the employer offered "light-duty positions for workplace injuries but not for the plaintiff's pregnancy" (Doc. No. 49 at 14);[7] and (2) Penske's accommodation policy, which facially provides for accommodation only for disabilities and religion and requires that an employee be able to "perform all essential functions of [her] job, unlike the PWFA and TPWFA" constitutes "direct evidence of a discriminatory motive." (Doc. No. 49 at 14.)

Even if the plaintiff assumes that Penske's failure to update its accommodation policy after the passage of the PWFA constitutes "direct evidence of a discriminatory motive," the plaintiff fails to show that Penske actually enforced this policy against her or that it refused to recognize the legal requirements imposed by the PWFA. Moreover, the plaintiff has not established, as a matter of undisputed fact, that Penske's "policy treats pregnant workers less favorably than it treats nonpregnant workers similar in their ability or inability to work." *Young*, 575 U.S. at 210.

She is not entitled to summary judgment on her sex and pregnancy discrimination claims.

---

[6] As discussed below, in connection with Penske's motion, the PWFA and the TPWFA do not appear to countenance discrimination claims apart from failure-to-accommodate claims.

[7] The plaintiff's situation is not comparable to the plaintiff's in *Young*, because she has not shown that Penske regularly offered light duty work to other employees with a lifting restriction as stringent as the plaintiff's.

### 4. Category 4: Disability Discrimination Under the "Regarded as" Prong of the ADA

"[T] o state the threshold condition of a 'regarded as' ADA claim, an employee need[s to] show that their employer believed they had a 'physical or mental impairment,' as that term is defined in federal regulations." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019). If the employee establishes that her employer "regarded" her as disabled under this standard, "the employee must still show that [her] employer discharged [her] (or took some other form of adverse employment action against [her]) because of, or 'but-for,' [her] actual or perceived physical or mental impairment." *Id.*

In the absence of direct evidence of discrimination, an employee bringing a "regarded as" claim may rely on circumstantial evidence under the "well-trod *McDonnell Douglas* burden-shifting framework." *Id.* Using this framework, the plaintiff generally may establish a *prima facie* case of discrimination by showing that "(1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment action, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Id.* at 320 (citation omitted).[8]

Regardless, once the employee establishes these elements (a "not onerous" requirement), the employer must then offer a "legitimate explanation for its action" (also not an onerous requirement). *Id.* At that point, "the burden then shifts back to the [employee], who must introduce

---

[8] The Sixth Circuit recognizes that this test does not "map neatly into a 'regarded as' claim," particularly because the first and fourth elements are already captured by the threshold requirement that the plaintiff show that the employer "regarded her" as disabled even though she was not. *Babb*, 942 F.3d at 320 n.8.

evidence showing that the [employer's] proffered explanation is pretextual." *Id.* at 320 (citation omitted).

The plaintiff asserts that she is entitled to summary judgment on her ADA claim. The first problem with her position is that, even assuming she can make the threshold showing that she was not actually disabled as that term is defined under the ADA but nonetheless was *regarded as* disabled by Penske, she cannot refute the fact that she requested an accommodation in order to continue working for Penske. If an employee is merely regarded as disabled, she *ipso facto* does not need an accommodation.[9]

Aside from this threshold issue, the plaintiff's argument that she is entitled to summary judgment on her ADA claim is nearly as perfunctory as the analysis of her discrimination claim. She asserts only that she can establish a *prima facie* case of discrimination. But, as set forth above, a plaintiff's ability to establish a *prima facie* case is just the first step of the analysis, even if she has direct evidence of discrimination. Moreover, unlike when a plaintiff is merely defending against a summary judgment motion filed by the defendant, the plaintiff, to be entitled to summary judgment, must do more than simply adduce some facts to support each element of her *prima facie* case—she must establish each element as a matter of undisputed fact. As discussed above, however, the question of whether the plaintiff was able to perform her job with a reasonable accommodation is a material, disputed fact. Likewise, the question of whether the defendant reasonably concluded that the only available and reasonable accommodation for the plaintiff was to place her on leave is a material, disputed fact.

---

[9] Notably, when an employee alleges discrimination under a "regarded as disabled" theory, the employer has no obligation to provide a reasonable accommodation because the individual is not "actually" disabled. 42 U.S.C. § 12201(h) (stating that an employer "need not provide a reasonable accommodation . . . to an individual who meets the definition of disability" under the "regarded as" prong of the statute).

The plaintiff is not entitled to summary judgment on her ADA discrimination claim.

5. *Category 5: Denial of Leave Rights and Retaliation for Seeking Leave Under the FMLA and the TMLA*

    a)     *FMLA Interference*

Trego's FMLA interference claim is based, first, on her allegations that she was eligible for FMLA leave at the time she gave birth in March 2024 but was denied leave under the FMLA based on the number of hours worked. She asserts that this was a "facial violation of the FMLA entitling her to summary judgment." (Doc. No. 49 at 18.) Second, she asserts that Penske was statutorily required, and failed, to give her notice within five days of learning that she might need FMLA leave and then terminated her for not providing certification of her need for leave, despite not giving her the required notice. (*Id.*) And third, she argues that, even if she lacked the requisite number of hours (which she disputes), Penske's "forcing" her to use leave under the PWFA "when she [did] not need it" "does not . . . stop her from being able to invoke the FMLA when she does need it at a later time." (*Id.* at 19 (citing *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 448–49 (6th Cir. 2007)).) Trego analogizes her situation to the plaintiff's in *Wysong*, where a pregnant employee was forced to use FMLA leave during her pregnancy, was not allowed to return to work until after giving birth, and therefore was "denied that leave when she actually needed it after the birth." (*Id.*) Finally, Trego asserts that "the Sixth Circuit has recognized that an employee can state a claim for FMLA violations without showing FMLA entitlement in certain circumstances." (*Id.* (citing Milman v. Fieger & Fieger, P.C., 58 F.4th 860, 868 (6th Cir. 2023)).)

Penske argues that the plaintiff cannot prove FMLA retaliation because it repeatedly invited her to request leave after the birth of her child, and she failed to do so. Moreover, her separation, which took place more than thirteen weeks after she gave birth, was due to her failure to return to work, to request leave, or to communicate with Penske.

To prevail on an FMLA interference claim, Trego must prove that

(1) she was an eligible employee as defined under the FMLA; (2) her employer was a covered employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take FMLA leave; and (5) her employer denied FMLA benefits to which she was entitled.

*Mullendore v. City of Belding*, 872 F.3d 322, 327 (6th Cir. 2017) (quoting *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577 (6th Cir. 2007). However, even when a plaintiff establishes a *prima facie* case, "[i]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Id.* at 327 (quoting *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)).

In this case, based on the facts set forth above, there is *at a minimum* a question of fact as to whether Trego notified Penske of her intention to take FMLA leave. The plaintiff's sole response to Penske's repeated requests for information regarding whether she wanted to extend her maternity leave or return to work was to state her belief that she had been terminated in July 2023. There is also a disputed question of fact as to whether the plaintiff was denied FMLA benefits to which she was entitled. Irrespective of what statutory scheme Penske believed the leave might fall under, the plaintiff was not formally terminated until June 5, 2024, and then only as a result of her failure to respond to Penske's request for information. Finally, the plaintiff's termination thirteen weeks after she gave birth suggests that she was, in fact, accorded more leave than the twelve weeks of leave guaranteed by the FMLA. Thus, it is not clear that the plaintiff suffered any damages based on the alleged FMLA interference. "If an employee does not suffer any damages, then the FMLA does not provide a remedy." *Theiss v. Walgreen Co.*, 632 F. App'x 829, 833 (6th Cir. 2015).

The plaintiff is not entitled to summary judgment on her FMLA claim.

*b)*      *TMLA Violation*

Trego asserts that Penske acknowledged that she was entitled to four months of leave under the TMLA, and granted her TMLA leave, but only granted her such leave from March 12, 2024 until April 22, 2024—a period of one month, one week, and three days—and then fired her for not returning to work in April 2024. (Doc. No. 49 at 20.) She contends that this is "direct evidence of a TMLA violation." (*Id.*)

Penske argues in response that, although FMLASource "preemptively" approved leave under the TMLA until April 22, 2024 based on Trego's expected due date, Trego never actually requested leave or notified Penske of her intent to take leave under the TMLA. Instead, she told Penske she believed she had been terminated in July 2023.

Trego also asserts that Penske violated the TMLA by not ensuring that information about leave under the TMLA was included in its employee handbook, in violation of Tenn. Code Ann. § 4-21-408(e) and that this, too, is a facial violation of the TMLA. (*Id.*) Penske does not respond to this argument.

As far as this court's research reveals, there are no reported Tennessee state court or federal court opinions outlining the elements of a TMLA claim, but the statute states, in relevant part, that

> [e]mployees who give at least three (3) months' advance notice to their employer of their anticipated date of departure for such leave, their length of leave, and their intention to return to full-time employment after leave, must be restored to their previous or similar positions with the same status, pay, length of service credit, and seniority, wherever applicable, as of the date of their leave.

Tenn. Code Ann. § 4-21-408(b)(1). Trego, however, has presented no evidence that she gave Penske notice of her intention to take maternity leave, the length of her anticipated leave, or her intention to return to full-time employment after leave.

Regarding Penske's alleged "facial" violation of the TMLA based on its failure to include reference to the TMLA in its employee handbook, the plaintiff fails to establish that she was

harmed by that failure or, indeed, that the statute creates a private right of action based on this administrative requirement.

The plaintiff is not entitled to summary judgment on her TMLA claim.

### 6. *Category 6: Retaliation*

All of the statutory schemes under which the plaintiff has asserted claims prohibit retaliation for engaging in activity protected by those schemes, including for requesting an accommodation. The plaintiff argues that she "easily" meets the elements of a *prima facie* case of retaliation, but establishing a *prima facie* case is not sufficient to entitle the *plaintiff* to summary judgment. She further asserts, however, that no reasonable jury could fail to find that she was subjected to retaliation when she was "fired specifically because she took medical leave following her delivery." (Doc. No. 49 at 15.)

This assertion is totally without merit. The evidence in the record, including FMLASource's and Penske's numerous communications with the plaintiff in the Spring of 2024 about whether she was requesting maternity leave or intended to return to work, is clearly more than sufficient to permit a reasonable jury to conclude that the plaintiff was terminated because she failed to respond to Penske's *multiple* requests that she communicate her intention either to take additional maternity leave—in addition to the leave FMLASource had preemptively granted her, despite her never requesting maternity leave—or to return to work. The plaintiff is not entitled to summary judgment on her retaliation claims.

### C.    Conclusion

The plaintiff has not established that she is entitled to summary judgment on any of her claims.

**III.    PENSKE'S MOTION FOR SUMMARY JUDGMENT**

**A.    Facts**

The facts set forth herein without a record citation are undisputed for purposes of Penske's Motion for Summary Judgment and are drawn from the plaintiff's Response to Penske's SUMF (Doc. No. 57). The court will attempt not to reiterate the background facts set forth above, but relates those facts that are particularly relevant and those that must be viewed in the light most favorable to the plaintiff as the nonmoving party for purposes of Penske's Motion for Summary Judgment.

*1.  The Plaintiff's Employment*

Brian Peterman testified that Penske drivers are hired specifically to be either "dynamic, local, yard, or route" drivers. (Doc. No. 51-3, Peterman Dep. 44–45.) Trego was hired as a "dynamic driver." (Doc. No. 57, Pl's. Resp. to Penske SUMF ¶ 6.) Dynamic drivers are "regional" drivers, driving a "sleeper" truck and doing layovers, and they do not do the same route every week. (Peterman Dep. 44.) As Peterman explained, dynamic drivers are the highest paid, because they are "ask[ed] . . . to do a lot." (*Id.* at 45.) They work alone, doing two to three layovers per week, and are "probably going to get a load" that requires unloading "a thousand tires." (*Id.*) Dynamic drivers may fill in for any other type of driver position on occasion. (*Id.* at 47–48.) Dynamic drivers are the "Swiss Army knife of drivers." (*Id.* at 48.)

Peterman also testified that Penske hauls passenger tires as well as "TBR" tires—that is, truck, bus, and radial tires. (Peterman Dep. 35.) Passenger tires weigh anywhere from 25 to 85 pounds, while TBR tires weigh from 80 to over 200 pounds. (*Id.* at 42.) Peterman estimated that 60 percent of the tires Penske hauls from the Lebanon Distribution Center, out of which the plaintiff worked, are passenger tires, and 40 percent are TBR tires. (*Id.* at 36.) Some delivery routes have a single stop, and some have multiple stops. "Probably 65 percent are multi-stops and 35

percent are one stop." (*Id.* at 36.) TBR tires are more likely to be on one-stop routes. (*Id.* at 37.) Peterman estimated that "30 percent" of loads from the Lebanon facility are "one stop, TBR tires." (*Id.* at 37.) Ordinarily, once a driver gets to a stop, the driver unloads every tire. (*Id.* at 37.) Peterman explained how the Penske driver unloads or "bounces" tires "off the back of the trailer, and the receiver takes them in." (*Id.*) He also explained that a "lumper" is "a third-party service that some receivers would employ, and instead of their own employees or associates assisting in the offloading of the trailer," the lumper would be the person assisting in offloading. (*Id.* at 42; *see also* Trego Dep. 72–73 (explaining that, when she unloaded tires, she would "pull them down and throw them . . . to somebody at the end of the trailer, and then they would be throwing or rolling them into the store").) Penske, in theory, could "pay for a lumper to offload a trailer," but it never does, because "unloading the tires is part of the driver's responsibility." (*Id.* at 42.)

However, if a load consists entirely of TBR tires, the driver does not unload it. She either drops off the entire trailer and picks up an empty trailer to return to the distribution center, or she backs the trailer into the dock, where the receiver unloads it using "mechanical means," typically a forklift. (*Id.* at 40.) Only on rare occasions would a driver, with assistance from the receiver, unload a few TBR tires manually. (*Id.* at 41.)

Trego, as a "dynamic" driver, was responsible for delivering tires to, and unloading them at, Bridgestone stores, distribution centers, and maintenance centers. (Doc. No. 63-1, Trego Dep. 72, 73.) The job description the plaintiff was given when she was hired identifies the job she would do as "[d]elivering product to customers; unload required." (Doc. No. 51-2 at 221.) It lists the physical requirements of the job as being able to "regularly lift and/or move up to 50 lbs/23kg and occasionally lift and/or move up to 100lbs/45kg." (Doc. No. 51-2 at 222.) As Melissa Fegley acknowledged during her deposition, however, the job description does not expressly identify what

tasks are considered "essential" to the plaintiff's job. (Doc. No. 51-5, Fegley Dep. 137.) According to Fegley, the team considering Trego's request for an accommodation came to a conclusion regarding the essential functions in a "conversation with operations and HR and the leave team with some consultation with safety." (Fegley Dep. 138.) She and Peterman were the ones who actually determined the "essential functions" as including the ability to do pre- and post-trip inspections, in order to comply with Department of Safety ("DOT") regulations, and the ability to unload tires, among others. (*Id.* at 31.) Fegley understood, based on conversations with Peterman, that approximately 60 percent of "delivery points" require the driver to physically unload freight. (*Id.* at 32.)

According to Penske, in order for a driver to perform the DOT-mandated pre-trip inspection, the driver must be able to lift the hood, which weighs 50 to 56 pounds; lower and raise the "landing gear" by turning a crank, which requires the ability to lift 25 to 45 pounds; and climb on and off the truck, the lifting requirement for which would vary based on the weight of the person but, for the "average person [would] be over 20lbs." (Doc. No. 51-5 at 223 (Aug. 27, 2023 email from Jackie Garmon to Fegley, Peterson and others, referencing an "ergonomics test").) Penske provides no details about this ergonomics test. The plaintiff points out that Garmon refers to having "reviewed" an ergonomics test, not having run one, and she claims that, regardless, the test he refers to is irrelevant to her position, because "yard" trucks are different from the long-haul truck she drove.

Trego also testified that her lifting restriction did not impact her ability to climb in and out of her truck cab, lower or raise the landing gear, open the truck hood, or perform truck inspections and that no one at Penske ever discussed with her the ability to do these tasks. (Doc. No. 51-1, Trego Decl. ¶¶ 4–6; *see also* Trego Dep. 61 (explaining that, with the hydraulic lift, "you barely

have to lift [the truck hood] up and it falls forward").) According to Trego, the only task she could not perform with her lifting restriction was "throwing tires." (*Id.* ¶ 8.) Moreover, she estimated that only about half of her "runs" (or routes) required unloading tires, and she believes this task was "not essential to doing [her] job." (*Id.*) She claims that she "could have paid a lumper fee to have someone else do the unloading or been given runs that did not require throwing tires." (*Id.*)

Trego also asserts that, while some of the other types of drivers also "touch freight," such as final mile drivers, others, such as shuttle drivers, do not. However, the portions of Peterman's deposition she cites for this position do not address whether any of these other drivers actually "touch freight." (*See* Peterman Dep. 46–48.)

### 2. *The Plaintiff's Request for Accommodations*

Penske has a dedicated Leave and Accommodations Team that supports employees with leave and accommodation requests. In July 2023, Penske provided training to the Leave and Accommodations Team on the newly enacted PWFA. FMLASource is a third-party vendor Penske uses to provide administrative support for tracking and securely storing employee medical, leave of absence, and accommodation records.

On July 28, 2023, Trego spoke with leave specialist Ivelis Horn. (*See* Doc. No. 44 at 205.[10]) As set forth above, Peterman had directed Trego to contact the Leave Team because she had been absent for three days. (Peterman Dep. 63.) The course of this conversation is disputed. According to Trego, she told whomever she spoke to,

---

[10] The exhibits on which Penske relies are attached to its Statement of Undisputed Material Facts as an undifferentiated mass, rather than as individually filed, labeled, findable exhibits, requiring the court to undertake a veritable Easter egg hunt to locate the documents to which it refers from among its nearly 300 pages of exhibits.

> I'm not quite sure why I even have to call you. I just had a regular doctor appointment and [am] trying to go back to work. But you need to clear me to go back to work is what Brian [Peterman] had told me.

(Trego Dep. 90.) She was asked what was "going on" but did not want to talk about it because it was a "private, personal matter." (*Id.*) She did not feel she should have been forced to disclose her pregnancy at that time. (*Id.*) But, according to Trego, Horn told her that, if she did not disclose what was going on medically, she could not be cleared to go back to work and would be placed on leave. (*Id.*) Consequently, Trego told her that she was pregnant. (*Id.*)

Horn immediately asked if she needed any accommodations. (*Id.*) Trego told her she did not know yet but did not think so. But she read to Horn what a Google search revealed about common pregnancy-related accommodations, including the need to drink more water, take more frequent restroom breaks, and not lift more than twenty pounds. (*Id.* at 91.) Trego felt that Horn was interpreting what Trego was reading off the internet as a request for accommodations, because she asked Trego how she felt the company could meet those accommodations. (*Id.* at 91–92.) Trego told her the need for extra hydration and restroom breaks did not need to be accommodated, as those issues were totally within her control, but, in any event she just wanted to go back to work. (*Id.* at 92.)

Trego claims they also discussed the twenty-pound lifting restriction in this first phone call (despite the fact that she, at that point, had no such restriction and had not seen her doctor yet). Trego testified that she told Horn that she could be sent to locations where the receiver unloaded or that she would be "willing to pay the lumper fee" to have someone else unload her truck. (*Id.* at 92–93.) Horn told her she could not go back to work until she confirmed with her doctor whether she did or did not have restrictions. (*Id.* at 95.) Horn's email to her after her phone call told her that, if she needed leave before Penske "work[ed] through the accommodations," she should

contact FMLASource. (*See* Doc. No. 44 at 205.) Trego testified, however, that Horn told her she was on leave during that first telephone call, specifically on unpaid leave. (Trego Dep. 97.)

Trego had a medical appointment the following Monday, where she confirmed her pregnancy, and her doctor completed the form Horn had given her, noting the twenty-pound lifting restriction and the need for more frequent hydration and restroom breaks. (Trego Dep. 95.) Trego testified that, based on the way Horn's email was phrased, she "possibly" contacted FMLASource because "[t]hat was the only way [she] could get more information." (*Id.* at 98.) Trego emailed Horn her doctor's restrictions on August 1, 2023 and, at the same time, asked her to confirm whether she had been placed on leave. (Doc. No. 44 at 213.) Horn responded, "if you need a leave until we work through the accommodations you can contact FMLA Source" and also reiterated that Trego would "nee[d] to request the leave of absence with FMLA Source." (*Id.* at 216.) She did not respond to the question about whether Trego had been "placed" on leave.

Later the same day (August 1, 2023), Horn emailed Penske Operations Supervisors, Jimmy Spring and Brian Peterman, and Human Resources Representative, Jackie Butera, that Trego had "requested an in-job accommodation." (Doc. No. 44 at 228.) Horn noted that, "[d]ue to the recent law," presumably referring to the PWFA, Trego is "under a protected class," and Penske would "need to try to accommodate her as best as we can. If there are any due [sic] hardships, we can schedule a call and discuss." (*Id.*) On August 2, 2023, Horn, HR Director Melissa Fegley, Butera, Peterman, and Tracy Wheat (another Penske Operations Manager) met to discuss the plaintiff's request for an accommodation.

Peterman testified that his role in the meeting was to "provide operational background on job duties." (Peterman Dep. 66.) According to Peterman, he relayed to the group that the dynamic driver position entailed "heavy touch," as well as "pre-trip, post-trip, cranking landing gear," and

that "a lifting restriction of 20 pounds was not attainable in the dynamic position." (*Id.*) According to Peterman, aside from unloading tires, the twenty-pound lifting restriction would prevent a driver from performing pre- and post-trip inspections, lifting herself in and out of the truck, potentially climbing into the back of the trailer, and cranking landing gear. (*Id.* at 67.) Peterman considered all of these tasks to be essential to the job of dynamic driver. (*Id.*) Horn's notes from the meeting indicate only that the group discussed that the "[l]ocation is unable to accommodate in the current role because the associate's job is touch freight and will require associate to lift more than 20lbs." (Doc. No. 51-4 at 78.)

Asked about how getting in and out of a truck qualified as "lifting," Peterman explained that, in his view, a person was required to reach overhead and "lift [her]self up inside the truck. You are using your arms to pull yourself into the vehicle, arms and legs," and he considered that to be lifting. (*Id.*) Cranking the landing gear involved a "cranking motion," but, he explained, "if the landing gear is flush against the ground . . . and you have to either push or pull it depending on if you're cranking up or down," that would involve "a lifting type motion." (*Id.* at 68–69.) He estimated that 55 to 60 percent of Trego's (or any dynamic driver's) loads require throwing tires. (*Id.* at 69.)

### 3. *The Plaintiff Is Placed on Leave*

On August 3, 2023, Horn opened a two-week leave request for Trego for the accommodation review period. On August 11, 2023, Horn notified the plaintiff by telephone call and email that Penske could not accommodate her restrictions in her current position and that they had not yet found an alternative position at her location. On August 15, 2023, FMLASource notified the plaintiff that she was approved for leave from July 27, 2023 through August 31, 2023. The type of leave in these communications was identified as under the ADA. On November 20, 2023, FMLASource clarified that the plaintiff's leave was approved under the PWFA, rather than

the ADA. (*See* Doc. No. 44 at 240.) Ultimately, Trego was provided leave as an accommodation through her expected due date of March 12, 2024.

In the August 11, 2023 email to Trego, Horn asked if she wanted Penske to search for other positions she might be able to perform. She followed up again on August 31, 2023. Trego never filled out the Vacant Position Search form that Horn sent to her.

In November 2023, Trego began working as a package handler for FedEx.

### 4. Another Employee's Leave Request

According to Penske, at the time the plaintiff requested an accommodation, Penske did not have an open shuttle position available or 'any available driving position that could accommodate Plaintiff's lifting restriction." (Doc. No. 44 at 294, Fleming Decl. ¶ 14.) Penske also asserts that it would not have been able to accommodate, and has never accommodated, any driver with a twenty-pound lifting restriction. (*Id.* ¶¶ 21, 23.) Peterman testified that he was aware of one other driver with a lifting restriction resulting from a workers' compensation injury who had been accommodated. (Peterman Dep. 55–56.) Peterman did not recall the exact restriction but he "believe[d] it was 40 pounds." (*Id.* at 58.) This individual performed shuttle work for approximately five months before being taken off work altogether due to his injury. (*Id.* at 58–59.)

### 5. The Plaintiff's Termination

On August 4, 2023, FMLASource (as Penske's agent) pre-approved unrequested leave for Trego from March 12, 2024, until April 22, 2024, which included some period of maternity leave. As set forth above, Trego gave birth on March 4, 2024. On April 8, 2024, FMLASource sent her an email reminding her that, based on FMLASource's records, she was approved for leave through April 22, 2024 and was expected to return to work on her "first regularly scheduled work day following this date." (Doc. No 51-2 at 248.) However, the same email also notified her that, if she needed to extend her leave, she should "please contact FMLASource." (*Id.*) She was also expressly

notified that, if she "intend[ed] to take additional time for bonding with [her] child immediately following [her] Maternity Leave, [she was] not expected to return to work at this time and . . . [would] receive an additional notice regarding the end date for that leave." (*Id.*) Alternatively, she was instructed to contact the Leave Team if she was ready to return to work. (*Id.*)

Trego did not respond to FMLASource or contact the Leave Team after receiving this email. On April 18, 2024, Horn reached out to Trego to follow up, reminding her that she had been approved for leave through April 22, 2024 and was expected to return to work on April 23, 2024, unless she requested an extension of her leave. (*Id.* at 252.) Horn directed Trego to reach out to FMLASource to request an extension if she wanted to extend her leave. (*Id.*) Trego responded to this email the next day, as follows: "My employment was effectively terminated when I was forced onto unpaid medical leave against my will in July 2023. I cannot return to a job I was terminated from ten months ago." (*Id.* at 254.)[11]

HR Manager Brittany Fleming, emailed and mailed Trego another notice on May 7, 2024, asking her to review the attached "notice regarding [her] returning to work from her approved leave of absence" and asking her to contact Fleming if she had any questions. (*Id.* at 257.) On May 15, 2024, Fleming followed up with a longer email to Trego, detailing Penske's attempts to contact her and "clarify[ing]" that, despite Trego's telling Horn on April 18, 2024 that she had been terminated in July 2023, Penske considered her to be a "current employee" who had been "placed on an approved leave of absence" through April 22, 2024. (*Id.* at 256.) Fleming noted that Trego had been given through May 13, 2024 to request an extension of her leave of absence but that, as of May 15, she had neither returned to work nor requested additional leave. (*Id.*) Fleming notified

---

[11] As stated above, unbeknownst to Penske, Trego had begun working as a package handler for FedEx in November 2023. It is unclear from the record whether she was on maternity leave from FedEx after giving birth.

her that, despite her lack of response, her deadline for requesting to extend her leave would be extended to May 22, 2024 but that, if Penske did not hear from her by that date, the company would assume that she was "no longer interested in returning to Penske and have voluntarily ended your employment with Penske." (*Id.*)

Trego, again, did not respond to this notice. On June 5, 2024, Fleming sent a letter to Trego informing her that, due to her failure to document her need for additional leave, Penske was "forced to separate [her] from employment due to [her] lack of response." (*Id.* at 257.) Her last date of employment, from Penske's perspective, was officially June 5, 2024. (Id.)

The plaintiff, by this time, had already initiated this lawsuit. (Doc. No. 1.)

**B.     Legal Claims**

Penske asserts that the plaintiff has "produced no evidence, direct or circumstantial, to support any of her chosen theories" and that Penske is entitled to summary judgment on all of her claims, which it identifies as falling within three categories: (1) sex and disability discrimination under Title VII, the THRA, and the ADA; (2) failure to accommodate under the ADA, TPWFA, and PWFA; and (3) interference with rights under the FMLA and TMLA. Penske also asserts that it is entitled to summary judgment on the plaintiff's claim for back pay because she failed to mitigate damages. Penske does not address the plaintiff's retaliation claims, except indirectly in a single footnote. (*See* Doc. No. 43 at 19 n. 9 ("To the extent Plaintiff alleges there is a connection between her leave or separation and engaging in any protected activity, she is wrong, and Plaintiff has not alleged any such facts.").)

The court, starting with the easiest issue first, finds, as set forth below, that Penske is entitled to summary judgment on the plaintiff's claims premised upon interference with her rights under the FMLA and TMLA and any discrimination or retaliation claims that are based on the plaintiff's termination as the actionable "adverse action." Material factual disputes, however,

preclude summary judgment on the plaintiff's accommodation claims under the PWFA and the TPWFA. In light of these factual disputes, the court declines to rule on Penske's claims for summary judgment on the plaintiff's pregnancy/sex and disability discrimination claims. Because Penske does not address the related retaliation claims, the court does not reach these either (aside from those arising from the plaintiff's termination). In addition, finding Penske's request for summary judgment on the issue of whether the plaintiff failed to mitigate her damages to be premature, the court declines to address it.

### 1. FMLA and TMLA Claims

As discussed above, to prevail on her FMLA interference claim, Trego must prove that

> (1) she was an eligible employee as defined under the FMLA; (2) her employer was a covered employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take FMLA leave; and (5) her employer denied FMLA benefits to which she was entitled.

*Mullendore v. City of Belding*, 872 F.3d 322, 327 (6th Cir. 2017) (quoting *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577 (6th Cir. 2007). However, even when a plaintiff establishes a *prima facie* case, "[i]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Id.* at 327 (quoting *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)).

To be an "eligible" employee under the FMLA, the employee must have been employed

> (i) for at least 12 months by the employer with respect to whom leave is requested . . . ; and

> (ii) for at least 1,250 hours of service with such employer during the previous 12-month period.

29 U.S.C. § 2611(2)(A). Here, it is undisputed that Trego had not been employed for a year when she first went on leave, and her leave was not characterized as FMLA leave—nor did she request leave under the FMLA or any other statute. As of January 2024, Trego had technically been

employed by Penske for twelve months and, based on her calculations at least, had worked more than 1,250 hours during the preceding twelve months. However, she remained on PWFA leave at that point, not FMLA leave. She had not requested FMLA leave and quite apparently believes she should not have been on leave at all during her pregnancy.

At the time she gave birth on March 4, 2024 and presumably might have wanted to request maternity leave, Trego had technically been employed for more than one year but, by her own calculations, had worked 1,227.5 hours—just under the required 1,250—during the preceding twelve months, counting from March 2023 through February 2024. (*See* Trego Decl. Ex. 1, Doc. No. 51-1 at 4 (providing a breakdown of "Total Time" in hours and "Drive Time" in hours for each month from January 2023 through July 2023, when she was placed on leave).) In other words, the plaintiff has not shown that, as of March 1, 2024, she had worked enough hours during the preceding twelve months to be an eligible employee under the FMLA. Accordingly, she was not entitled to FMLA leave. On this basis alone, Penske is entitled to summary judgment on the plaintiff's FMLA interference claim.

Regardless, even if she were considered to have been an eligible employee at the time she needed maternity leave, Trego never gave Penske notice of her intention to take FMLA leave, and she was never denied any leave to which she was entitled. In fact, she had been granted a full thirteen weeks of maternity leave before Penske notified her that it was terminating her employment.

To the extent the plaintiff is attempting to argue that her termination on June 5, 2024 qualifies as an adverse action in retaliation for her having taken FMLA leave, that attempt is unavailing. First, again, Trego never requested FMLA leave, so her termination could not have been in retaliation for exercising rights under the FMLA. Setting that aside, the evidence in the

record establishes that Penske's decision to terminate Trego was based on Trego's failure to respond to any of Penske's repeated requests for confirmation regarding whether she wanted to extend the maternity leave it had already preemptively accorded her under the TMLA or return to work. The plaintiff has presented no countervailing evidence that suggests that Penske's reason for her termination was pretextual. Under the facts presented, no reasonable jury could find that Penske interfered with the plaintiff's FMLA leave rights or retaliated against her for taking FMLA leave.

The plaintiff's TMLA claims fail for largely the same reason. Although Penske does not deny that the plaintiff was entitled to TMLA leave,[12] the TMLA also requires an employee to give advance notice of her intent to take leave, the "length of leave" anticipated, and the employee's "intention to return to full-time employment after leave," in order to be guaranteed the right to be "restored to [her] previous or similar position[]." Tenn. Code Ann. § 4-21-408(b)(1). The plaintiff never requested any length of maternity leave and, despite being requested to do so multiple times, never confirmed her intention to return to full-time employment with Penske following leave. Under these circumstances, the plaintiff was not entitled under the TMLA to be returned to her position, and Penske's decision to terminate her based on her failure to respond to its requests for such confirmation cannot be deemed retaliatory.

Penske is entitled to summary judgment on the plaintiff's FMLA and TMLA interference claims.

---

[12] The TMLA defines as eligible those employees who have been "employed by the same employer for at least twelve (12) consecutive months as full-time employees." Tenn. Code Ann. § 4-21-408(a). By March 2024, Trego had been employed by Penske for more than one year, even though she had been on leave for much of that time.

## 2. Discrimination/Retaliation Claims Premised Upon the Plaintiff's Termination

The plaintiff claims that her "termination" from employment was an adverse employment action that supports her *prima facie* claims of discrimination and retaliation under the various statutory schemes on which her claims are premised. For the reasons outlined above—namely, the plaintiff's failure to respond to Penske's pleas that she inform it as to whether she was requesting additional leave under any available federal or state statute or, alternatively, intended to return to work—the court finds no reasonable jury could conclude that Penske's stated reason for terminating the plaintiff was pretext for retaliation or discrimination. Penske is entitled to summary judgment on any of the plaintiff's claims that depend on her termination as the adverse employment action supporting the claim.

## 3. Failure to Accommodate Under the PWFA and TPWFA

The plaintiff denies that she brings an ADA failure-to-accommodate claim. (Doc. No. 56 at 4.) She asserts that she does bring claims for "discrimination for requesting and needing accommodation under the PWFA and TPWFA" and "failure to engage in the interactive process" and "forced leave" under the PWFA and TPWFA that Penske's motion does not address (*Id.* at 9 n.8 and 4–5.)

Penske maintains that it had no need to address "fictitious" claims in the plaintiff's pleading and that "failure to provide a reasonable accommodation is the only type of discrimination protected under the PWFA." (Doc. No. 62 at 1 n.1.) The case it cites refers to the West Virginia Pregnant Workers Fairness Act, *see Figlar v. Simonton Windows & Doors, Inc.*, No. 1:23-CV-30, 2025 WL 941036, at *5 (N.D.W. Va. Mar. 27, 2025), but its point is well taken.

The PWFA makes it unlawful for a covered employer to fail to "make reasonable accommodations" for pregnant workers or to require pregnant works to accept any accommodation "other than any reasonable accommodation arrived at through the interactive process" 42 U.S.C.

§ 2000gg-1.[13] The EEOC, charged with promulgating implementing regulations and enforcing the statute, construes the PWFA as "appl[ying] only to accommodations," while other federal anti-discrimination laws "make it illegal to fire or otherwise discriminate against employees . . . on the basis of pregnancy." *See* https://www.eeoc.gov/wysk/what-you-should-know-about-pregnant-workers-fairness-act. The court construes the plaintiff's discrimination claims under the PWFA and the TPWFA as essentially a single claim based on the failure to provide a reasonable accommodation.

The gist of the plaintiff's claim is that Penske unreasonably forced her to take medical leave as the only possible accommodation, despite the availability of other non-leave accommodations. Penske argues that it is entitled to summary judgment on this claim because Trego cannot show that she was "qualified" or that Penske failed to offer her a reasonable accommodation.

More specifically, Penske asserts that Trego was not a "qualified individual" under the PWFA because "her inability to perform the essential functions of her job—namely unloading tires to Penske's customers and conducting federally-mandated safety inspections—could not be reasonably accommodated, even temporarily." (Doc. No. 43 at 25.)[14] The court, in short, is not persuaded. Under both the ADA and the PWFA, temporary medical leave itself may, in fact, be a reasonable accommodation for a pregnant employee unable to perform her essential job duties,[15]

---

[13] The PWFA also prohibits retaliation against a pregnant worker for requesting a pregnancy-related accommodation. 42 U.S.C. § 2000gg-1. The plaintiff's retaliation claims not based on her termination are addressed below.

[14] The issue of whether Penske failed to accommodate the plaintiff's need for additional water and restroom breaks is simply a non-issue. The plaintiff's focus on it does nothing to further her substantive claims.

[15] *See King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 561 (6th Cir. 2022) (recognizing that "[l]eave as a reasonable accommodation is . . . consistent with [the ADA's] statutory purpose because it enables the employee to return to work following the period of leave

as Penske itself implicitly recognized by placing the plaintiff on leave as an accommodation. In addition, the PWFA recognizes that a worker may remain "qualified" even if unable to perform an essential function of her job, if the inability is "temporary" or "can be reasonably accommodated." 42 U.S.C. § 2000gg(6). In other words, a temporary inability to perform an essential job function does not necessarily disqualify a pregnant employee from being "qualified."

Moreover, irrespective of whether unloading tires was one of the essential functions of the plaintiff's job, the PWFA appears to impose broader obligations on employers to reach a reasonable accommodation, through the interactive process, than the ADA does. Under the regulations (which, again, had not gone into effect in July 2023), an employer may not "require[e] a qualified employee to take leave if another reasonable accommodation can be provided." 29 C.F.R. § 1636.1(b)(4). Likewise, an employer may not require an employee to take leave "if another accommodation can be provided . . . that does not result in an undue hardship for the covered entity." *Id.* § 1636.4(d)(1). Under the PWFA, reasonable accommodations may include the "[t]emporary suspension of essential function(s) and/or modifications or adjustments that permit the temporary suspension of essential function(s)." *Id.* § 1636.3(h)(iv). In addition, reasonable accommodations include

> [j]ob restructuring; part-time or modified work schedules; . . . acquisition or modification of . . . devices, including devices that assist with lifting or carrying for jobs that involve lifting or carrying; . . . ; . . . assignment to light duty or modified work; . . . and other similar accommodations for employees with known limitations under the PWFA.

29 C.F.R. § 1636.3(i)(2).

---

requested as an accommodation—*i.e.*, it enables the employee to perform the essential function of attendance").

The term "undue hardship" under the PWFA has the same meaning as it does under the ADA. *See* 42 U.S.C. § 2000gg(7) (incorporating by reference the definition provide in 42 U.S.C. § 12111). The ADA defines the term as "an action requiring significant difficulty or expense" when considered in light of the following factors:

> (i) the nature and cost of the accommodation needed under this chapter;

> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

> (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10); *see also* 29 C.F.R. § 1636.3(j).

In this case, the evidence introduced by both parties indicates that Penske, on its own and without input from the plaintiff, identified the essential job duties of the dynamic driver position and unilaterally decided that the plaintiff could not perform those functions with a twenty-pound lifting restriction. It maintains that all of its truck-driving jobs require the ability to lift the hood of the truck in order to perform a pre-trip inspection, but no one at Penske asked the plaintiff about her ability to perform that task or the other ancillary tasks that Penske unilaterally decided required lifting more than twenty pounds. It refers to its review of an ergonomics study, but it has not presented actual evidence that this study pertained to the trucks the plaintiff was hired to drive.

Penske claims that restructuring the plaintiff's job to eliminate the freight-unloading requirement would have posed an undue hardship, but there is no evidence that it considered, for instance, allowing the plaintiff to work part-time, assigning her only those jobs in a given week

that involved transporting TBR tires that are unloaded mechanically rather than manually, allowing her to fill in on an as-needed basis on routes that did not require manually unloading tires, or allowing her to pay a "lumper fee"—that is, to hire someone to unload for her. Finally, its consideration of "undue hardship" is cursory at best, made without reference to any of the factors identified in 42 U.S.C. § 12111(10).

The court is cognizant that Penske did not have the benefit or any caselaw interpreting the PWFA, which went into effect weeks before the plaintiff announced her pregnancy-related job restrictions, and the implementing regulations did not take effect until after this lawsuit was filed. Penske, however, does not raise an argument regarding the timing of the passage of the Act and regulations. It simply argues that leave was the only reasonable accommodation it could have offered. The court nonetheless finds that there is a question of fact as to whether, under the PWFA, Penske had an obligation to engage in the interactive process *with* Trego in an attempt to explore with her, and attempt to identify, other possible accommodations that would not have required her to take complete medical leave for eight months.

Penske, in short, is not entitled to summary judgment on the plaintiff's PWFA and TPWFA claims based on failure to reasonably accommodate, failure to engage in the interactive process, and requiring the plaintiff to take leave.

Penske does not move for summary judgment on the plaintiff's PWFA/TPWFA retaliation claim. That claim appears to overlap almost entirely with the failure to accommodate claim, as a result of which the defendant has not shown that it is entitled to summary judgment on this claim either.

### 4. Disability and Sex Discrimination and Retaliation Claims and Damages

Penske argues, in a nutshell, that it is entitled to summary judgment on the plaintiff's disability and sex discrimination claims because the plaintiff cannot establish any of the elements

of a *prima facie* case to support these claims. (Doc. No. 43 at 14–20.) The standards under the ADA and Title VII (and the THRA) arguably differ somewhat from the PWFA and TPWFA standards that apply to the plaintiff's failure to accommodate claims. However, all of these legal claims and the facts supporting them, and the relief available should the plaintiff prove them, overlap sufficiently that it would be a waste of judicial time and resources for the court to address them. Granting summary judgment to Penske, that is, would not appreciably shorten the trial or affect the parties' trial preparation. Given that the court has already determined that the plaintiff's PWFA and TPWFA claims must be resolved by a jury, the court declines to consider whether Penske is entitled to summary judgment on these related claims. Penske has not directly addressed the plaintiff's retaliation claims, and the court denies summary judgment on those claims as well (except insofar as the retaliation claims arise under the FMLA or TMLA, as discussed above).

The court likewise declines to address Penske's claim that it is entitled to summary judgment on the plaintiff's back pay damages claim based on a failure to mitigate damages. Failure to mitigate is an affirmative defense on which Penske bears the burden of proof, once the plaintiff proves that she is otherwise entitled to back pay. *See Nat'l Lab. Rels. Bd. v. Bannum Place of Saginaw, LLC*, 97 F.4th 351, 363 (6th Cir. 2024). As it is unclear at this juncture whether the plaintiff is otherwise entitled to damages in the form of back pay, the court finds that it is premature to consider a failure to mitigate.[16]

---

[16] The dismissal of the plaintiff's claims arising from her termination in June 2024 may obviate her claim for back pay.

**IV.      CONCLUSION**

As set forth above, the plaintiff's Motion for Summary Judgment will be denied in its entirety. Penske's Motion for Summary Judgment will be granted in part and denied in part. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge